Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES LLC
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SUSAN A. YOUNG,                                           09 CV 9811 (RJH) (THK)

                Plaintiff,

        -against-

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY and CONTINENTAL
CASUALTY COMPANY,

                Defendant.
-----------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

Of Counsel:

Scott M. Riemer

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ii

COUNTER-STATEMENT OF FACTS .......................................................................... 1

ARGUMENT .................................................................................................................. 9

      I.   HARTFORD'S DETERMINATION IS NOT SUPPORTED
          BY SUBSTAINTIAL EVIDENCE ................................................................ 9

           A.  THE TOPPER REPORT............................................................10

           B.  ATTENDING PHYSICIAN'S STATEMENTS.........................11

           C.  YOUNG'S DISABLING MIGRAINES AND THE *TODD* CASE .............13

     II.  HARTFORD FAILED TO PROVIDE YOUNG WITH A FULL AND
          FAIR REVIEW ........................................................................................14

     III.  HARTFORD'S CONFLICT OF INTEREST IS OF GREAT
          IMPORTANCE...........................................................................................14

     IV.  HARTFORD SHOULD BE SANCTIONED PURSUANT TO
          FED. R. CIV. P. 37(c)(1) .........................................................................18

CONCLUSION.............................................................................................................20

i

TABLE OF AUTHORITIES

*Curry v. American International Group*, 579 F. Supp.2d 413 (S.D.N.Y. 2008),
*aff'd*, 341 Fed. Appx. 731 (2d Cir. 2009) ..............................................................13

*Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133 (2d Cir. 2010)..............9

*Finley v. Hartford Life & Accident Ins. Co.*, 2009 U.S. Dist. LEXIS 105516
(N.D. Ca. Oct. 26, 2009)...................................................................................17

*Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914
(7th Cir. 2003).................................................................................................14

*Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75 (2d Cir. 2009) .......................................9

*Levitian v. Sun Life and Health Ins. Co. (U.S.)*, 2011 U.S. Dist. LEXIS 14113
(S.D.N.Y. Feb. 9, 2011).....................................................................................12

*Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 1343 (2008). .................................14, 17

*Miller v. American Airlines, Inc.*, 2011 U.S. App. LEXIS 1462
(3rd Cir. Jan. 25, 2011) .....................................................................................10

*Miller v. United Welfare Fund*, 72 F.3d 1066 (2d Cir. 1995)...................................................9

*Montour v. Hartford Life & Accident Ins. Co.*, 582 F.3d 933 (9th Cir. 2009).......................17

*Nelson v. UNUM Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 24341
(E.D.N.Y. Mar. 27, 2006) .................................................................................11

*Pagan v. NYNEX Pension Plan and NYNEX Corp.*, 52 F.3d 438 (2d Cir. 1995)................9

*Todd v. Aetna Health Plans*, 62 F. Supp. 2d 909 (E.D.N.Y. 1999), *aff'd* 31 Fed.
Appx. 13 (2d. Cir. 2002)....................................................................................13

*Williams v. Hartford Life & Accident Ins. Co.*, 2009 U.S. Dist. LEXIS 94857
(S.D.Oh. Sep. 25, 2009)....................................................................................17

FEDERAL RULES OF CIVIL PROCEDURE

FED. R. CIV. P. 26(a)......................................................................................18, 19

FED. R. CIV. P. 37(c)(1) ....................................................................................18

COUNTER-STATEMENT OF FACTS

As a result of a series of injuries, Young suffers from herniated discs, cervical spondylotic myelopathy, cervicalgia, and facet syndrome.  Young submitted to multiple invasive operations and procedures, including:  posterior cervical laminectomy, cervical disketomy, radio frequency lesioning ("RFL"), and trigger point injections.  These operations and procedures, unfortunately, provided only temporary relief; in fact, immediately following her third RFL procedure on April 8, 2008, Young developed migraine headaches that cause severe pain, photophobia and hyperacusis.

Despite her disabilities, Young made multiple attempts to return to work as a transactional attorney at Milbank, subject to a part-time schedule with restrictions, limitations, and extensive ergonomic re-fitting of her office.  For over 4 years, Hartford paid Young disability benefits until it terminated her benefits based on a series of errors, including: overemphasizing/de-emphasizing evidence, failing to appropriately investigate Young's claim, and relying on an erroneous interpretation of the Topper Report.

**Young's Occupation**

The parties do not dispute that the Physical Demands Analysis ("PDA") completed by Milbank, accurately reflects the description of Young's occupation as a transactional attorney. (Hartford Br., pp. 3-4, 20; 1055-56).  The PDA indicated that Young's primary duties consisted of revising documents, negotiating in person and over the phone, and attending meetings inside and outside of the office.  (1055-56).  The PDA further indicated that Young must be able to sit at one time for 8+ hours, 5 days per week and weekends as needed; that she must be able to stand for a total of 2 hours per day in half hour increments; that she must be able to carry documents weighing between 3 to 10 pounds; that she must be able to twist her head 66-100% of the day;

1

that she must have upper extremity range of motion for 66-100% of the day; and that she must have whole body range of motion 66-100% of the day.  (*Id.*).  According to the U.S. Department of Labor's Dictionary of Occupational Titles, Young's occupation as a "Lawyer, Corporation," is classified as "sedentary."  (Ex. H).

**<u>Young's Disabilities</u>**

### *<u>Cervical Spine</u>*

On or about Memorial Day of 2004, Young developed sudden severe pain in the back of her neck, which radiated into her right shoulder and down the right arm to all fingers of the hand, <u>as she was getting out of the shower and brushing her teeth</u>.  (909).  Immediately following this injury, Young sought treatment from Drs. Edward Mendelssohn, Jonathan Levin, and Michael Mizhiritsky.  An MRI dated June 12, 2004, revealed herniated discs at the C5-6 and C6-7 levels. (1067).  By August 17, 2004, Young stopped working at Milbank as a result of her cervical spine problems and applied for short term disability (STD) benefits.  (1080).  From August 30, 2004 through October 29, 2004, Hartford paid Young STD benefits.  (127, 1119, 1129).  On October 4, 2004, Dr. Mizhiritsky administered 3 trigger point injections and prescribed physical therapy. (1062).  By November 22, 2004, however, Young returned to work on modified duty subject to the restrictions set by Dr. Mizhiritsky.  (1057, 1059).

After working for 2 months, Young continued to experience problems with her cervical spine.  On January 25, 2005, Dr. Barry Moore[1] diagnosed cervical spondylotic myelopathy and informed Young that surgery was required to attempt to correct this condition.  (910).  On February 14, 2005, Young underwent posterior cervical laminectomy.  From February 14 through May 15, 2005, Hartford paid Young her second set of STD benefits.  (1080).

---

[1] Dr. Moore treated Young's father for a similar condition.  He was not a family friend as alleged by Hartford.

2

Young's cervical condition makes her susceptible and vulnerable to new injury. She has restricted range of motion of her neck, which makes it difficult to turn her head left and right and up and down. As a result:

- On July 8, 2005, Young advised Hartford that she fell going upstairs. As a result of using her left arm to catch herself, Young was experiencing "steady pain in her neck and a little in her shoulder." (192).

- On September 24, 2005, Young was involved in a vehicle accident, in which she was traveling as a backseat passenger. As a result, Young experienced increased tingling and numbness. (186-87, 181, 900).

- On December 6, 2005, Young advised Hartford that she had fallen down 5 stairs in her 3-story apartment after taking a shower. As a result of this fall, Young experienced "a different kind of pain." Young explained that the pain "feels like pain following [] surgery and is at the incision site, not affecting the lower or mid back- [it] is in the neck." (181).

- On August 24, 2006, Young advised Hartford that she recently tripped and stumbled over the sidewalk. She also indicated that she spoke with her doctor because the range of movement for her head and neck was almost back to zero. (126).

- On January 16, 2007, Young advised Hartford that she was hit in the head by someone who slipped on the wet floor in the subway. As a result, she was working from home. (113).

- On May 30, 2007, Young advised Hartford that she was recently almost hit by a car. As a result, Young indicated that her neck "locked up again" and explained that according to her physical therapist, range of motion was 10-15 degrees. (105-106).

- On August 17, 2007, Young advised Hartford that about 3 weeks ago, she was hit in the shoulder area by a person on the subway who tripped. She further explained that as a result, she experienced pain. (102).

Hartford's counsel essentially scoffs at these injuries implying that their frequency make them unbelievable. But, counsel ignores the fact that Young's condition makes her fragile and vulnerable to further injury. Counsel also ignores the fact that at the time Hartford fully investigated Young's claim, but nonetheless continued to find her to be disabled. Indeed,

Hartford's own surreptitious video surveillance confirmed that Young walks with a very stiff neck. The investigator's report provides, "[s]he entered the building ambulating in a stiff manor (sic) (1249). The investigator concluded, "[a]t this time the claimant's reported functionality is consistent with surveillance." (1249-50). Hartford's attempt to use these injuries as fodder in an attempt to attack Young's credibility is both belated and disingenuous. If Hartford actually had *bona fide* questions about the veracity of these injuries, the time to raise them was then, not now.

As a result of these injuries, Young subjected herself to additional invasive operations and procedures, including:

- Anterior cervical disketomy and fusion performed by Dr. Roger Ostdahl on April 28, 2006. (132).

- Nerve blocks and steroid injections performed by Dr. Emile Hiesiger. (90).

- Radiofrequency lesioning procedures performed by Dr. Hiesiger on December 5, 2007, January 9, 2008, April 8, 2008, and December 9, 2008. (66-67, 380-81, 383-85, 414-17).

Unfortunately, these procedures and treatments provided Young with only temporary relief. Young continued to experience compromised functional capabilities, including: restricted range of motion in the neck and upper right extremity; difficulties with sitting without support for her head, sitting back in a chair, standing for long periods of time, and writing; and numbness and tingling in the right hand (her dominant hand). (80, 83, 96, 375).

### *Migraines*

Despite various regimens of medications and supplements, beta blockers, and Botox treatment, Young continues to suffer from migraine headaches that cause severe pain, photophobia and hyperacusis. (Ex. G.). Contrary to Hartford's assertion that Young's migraines began when she learned that she was going to be terminated by Milbank on April 4, 2008, the record fully supports that Young began to experience disabling migraines immediately following

her third radiofrequency lesioning procedure on April 8, 2008 performed by Dr. Hiesiger.  (83, 380-81).  This is confirmed by Dr. Mauskop in his April 17, 2009 letter, which Hartford refused to review:

> Ms. Young suffers from chronic migraines.  These began in April 2008 the day after Ms. Young underwent radiofrequency lesioning of a nerve root at C2/3 level on the right side. . . . In my experience in the field of headache medicine, I find it not at all uncommon that the trauma of the procedure triggered Ms. Young's migraines.  I believe the headaches are the result of the procedure.

(Ex. G).

Hartford also repeatedly chastises Young for not letting Hartford know prior to August that she was being terminated by Milbank, implying that Young had something to hide; that she had some secondary gain (Hartford does not explain what) by keeping Hartford in the dark.  But, Milbank's termination of Young did not affect her continued eligibility for benefits under the Hartford policy.  The only practical effect was that Young would no longer be eligible for the Work Incentive Benefit, which offset and decreased Hartford's liability to pay Young's full LTD benefit amount.  As a result, Hartford's liability to Young would be bumped up to $11,500.00 per month – the full LTD benefit amount.  Thus, Hartford assigns an importance to early notification that Young did not feel at the time from her perspective.  Moreover, when Young did notify Hartford during the week of August 9, 2008 (337) that her employment would be terminated at the end of the month, Hartford did not assign any importance to it.  Hartford did not raise it as a reason for denial in its termination letter, nor even mention it in any way.  (221-24).  Hartford did not even inquire of either Milbank or Young as to the reasons why.  Hartford only raises it now in a belated attempt to attack Young's motivation and credibility.

**Young's Attempts to Return To Work**

Despite Hartford's numerous attacks on her credibility, the record establishes that not only did Young seek extensive and invasive treatment in an attempt to improve her condition, but that she tried to move mountains to continue her career.  Despite her disabilities, Young made multiple attempts to return to work on a part-time basis, including:

- From November 22, 2004 through February 13, 2005, Young returned to work on modified duty subject to the restrictions set by Dr. Mizhiritsky.  (1057, 1059).

- From February 21, 2006 through April 27, 2006, Young returned to work on a 21-hour per week part-time schedule with limitations and restrictions, and ergonomic re-fitting of her office.  (708-10, 750, 788).

- From September 28, 2006 through August 29, 2008, Young returned to work subject to the work activity and recommended workplace modifications recommended by Dr. Ostdahl.  (507, 550-55).

Even to work on a part-time basis, Young needed extensive accommodations from Milbank, including restructuring her office with ergonomic equipment.  Much of this equipment was paid for by Hartford (as Hartford repeatedly mentions in its brief)(pp. 7-9).  This was not, however, an altruistic venture.  By investing a few thousand dollars in equipment, Hartford saved many thousands more in reduced benefits.  Indeed, Hartford considered Young's return to work so successful that it completed a "Success Story" regarding Young's return to work with modifications on October 28, 2006.  (Ex. J 1341).  A success story is when a Hartford claims employee takes action to return a claimant to work, thereby saving Hartford money.  When a claimant returns to work, Hartford's liability to pay the full long term disability benefit amount decreases pursuant to the Policy.  (Ex. I).  Notably, the first line of Young's "Success Story" emphasizes that she was a "high wage earner."  (Ex. J 1341).

6

**Substantial Evidence Establishing Disability**

During the appeal process and in its brief, Hartford has focused almost exclusively on Young's migraine headaches as a source of disability.  But, even without reference to her migraine headaches (and Young does not concede anything in that regard), Young is disabled from working full-time in her occupation solely as a result of her cervical condition.  This is confirmed by both Dr. Hiesiger and Hartford's Dr. Topper, even though Dr. Hiesiger readily admitted that her neck pain is "significantly better."  (339).[2]  This, however, attests to how bad her pain was, not how improved she is now.

Both Dr. Hiesiger (376, 432) and Dr. Topper (321-22) have prescribed restrictions and limitations that prevent Young from performing the duties of her occupation as specified in the PDA.  In fact, as early as February 27, 2008, Dr. Hiesiger indicated that these restrictions and limitations were permanent.  (432).  These restrictions and limitations, and how they preclude her from performing the duties of her occupation, are described in detail in Section I(A) and (B).

Moreover, Young's migraine headaches materially add to her disability.  As Dr. Hiesiger opines in his October 6, 2008 report, "[g]iven the severity and the frequency of the migrainous pain currently afflicting Ms. Young, she is not able [to] work."  (340).  Hartford attempts to attack this opinion by indicating that Dr. Hiesiger "changed his opinion" (Hartford Br., p. 22), implying that Hiesiger was now just merely trying to help his patient.  But, Dr. Hiesiger's opinion seems like a "change of mind" to Hartford because Hartford has at all times ignored the existence of the August 8, 2008 treatment note, which indicated that the headaches resumed despite the Inderal.  (341).  Indeed, despite providing a 15-page factual statement in its Brief, Hartford fails to even acknowledge the August 8, 2008 office visit with Dr. Hiesiger and the

---

[2] In his August 6, 2008 APS, Dr. Hiesiger continued to indicate, "neck stiffness and paraspinal" as Young's subjective symptoms and "decreased cx ROM, muscle spasm, tender C2-3—C7-T1 bilateral" as his exam findings. (375).

resultant treatment note.  Incredibly, when Hartford was listing the specific treatment notes that Young attached to her appeal, it did not even list it.  (Hartford Br., p. 13).  It is hard to miss; it is the first treatment note attached to the appeal.  (341).

Hartford's refusal to acknowledge the note is understandable.  It completely undercuts the stated reason for termination that Young's headaches have resolved.  The note begins, "H/A returned—2/wk."  (341).

<u>ARGUMENT</u>

I. HARTFORD'S DETERMINATION IS NOT SUPPORTED BY SUBSTAINTIAL EVIDENCE

An administrator's determination is arbitrary and capricious if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Durakovic v. Building Service 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010); *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 82-83 (2d Cir. 2009); *Pagan v. NYNEX Pension Plan and NYNEX Corp.*, 52 F.3d 438, 442 (2d Cir. 1995). "Substantial evidence is such that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker] and . . . requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). A court is not free to substitute its own judgment for the judgment of the administrator. *Pagan*, 52 F.3d at 441.

Here, there is no dispute that Young's occupation was sedentary (386, 488, 556, 665) and that the PDA provides conclusive evidence of the duties and functional requirements of Young's occupation. (Hartford Br., pp. 3-4). Therefore, in order to justify a reversal of its prior findings of disability, there must be substantial evidence to support of its August 27, 2008 conclusion that Young could perform the duties as described in the PDA on a full-time basis. (223).

Hartford's determination is not supported by substantial evidence. In fact, in the body of its brief, Hartford formally argues only that it provided Young with a full and fair review and that it was not influenced by its conflict of interest, not that its determination was supported by substantial evidence. (Hartford Br., pp. 19- 24). However, because Hartford discusses several documents in its full and fair review argument, each is addressed below. <u>None</u> are substantial evidence for a reversal of its earlier determination of disability.

9

A.      THE TOPPER REPORT

Hartford asserts that "Dr. Topper, the independent medical record peer reviewer, agreed with Dr. Hiesiger's limitations and found that Young was able to perform <u>sedentary</u> work." (Hartford Br., p. 20) (emphasis added).  This is simply incorrect.  Dr. Topper never opined that Young could perform <u>sedentary</u> work.  He opined only that she could perform <u>light</u> work, which is insufficient, because Young specifically is unable to do the prolonged sitting required in a sedentary job.  Moreover, Dr. Topper opined that Young could perform light work, but only with crucial restrictions that are particularly applicable to Young's occupation:

|  | Topper Report | Physical Demands Analysis |
|---|---|---|
| Sitting | "The claimant's continuous sitting time needs to be restricted to two hours […]"<br><br>"8 hours a day 5 days a week . . . as long as she is not exposed to sustained neck posturing and repetitive flexion/extension movements." | 8+ hours at one time.<br><br>Twisting of head, upper extremity, whole body 66-100% [of a work day][3] |
| Range of Motion | "The claimant can perform repetitive neck flexion and extension and sustained neck postures only occasionally, less than two and a half hours a day […]." | Twisting of head, upper extremity, whole body 66-100% [of a work day] |

(321-22; 1055-56).

Therefore, if anything, Dr. Topper's report <u>supports</u> Young's claim that she is disabled from working in her regular occupation on a full-time basis.  Hartford's reliance on Dr. Topper's opinion is misplaced.  *See, e.g., Miller v. American Airlines, Inc.*, 2011 U.S. App. LEXIS 1462, *42 (3rd Cir. Jan. 25, 2011) ("it is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the

---

[3] According to the PDA, Young's average workday is 12 hours.  (1055).

specific job requirements of a position."); *Nelson v. UNUM Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 24341, *30 (E.D.N.Y. Mar. 27, 2006) ("Because Unum categorized plaintiff's occupation in contravention of the plan's plain language, plaintiff was denied the full and fair review" and the denial was arbitrary and capricious).

        B.      <u>ATTENDING PHYSICIAN'S STATEMENTS</u>

Hartford cites Dr. Hiesiger's Attending Physician's Statements as support for its termination of benefits, but there is a contradiction between the positions it has taken during the claim process and now in litigation.  (223; Hartford Br., p. 20).  In its benefit termination, Hartford relied on the August 6, 2008 APS to terminate benefits (223), ignoring the earlier February 27, 2008 APS, which Hartford used at the time to approve continued benefits.  (Hartford Br., p. 11).  By contrast, in its Brief, Hartford now relies on the February 27, 2008 APS, and only cites the August 6, 2008 APS because Dr. Hiesiger "does not identify Young's migraines as a condition that was preventing her from working."  (Hartford Br., p. 12).

Hartford's new emphasis on the February 27, 2008 APS is a strategic attempt to avoid having to explain the discrepancy between:  (1) granting Young LTD benefits based upon the February 28, 2008 APS; and (2) terminating Young LTD benefits based upon the August 6, 2008 APS.  This discrepancy cannot be explained because the restrictions and limitations in both APSs are identical.  From a functional standpoint, nothing changed:

11

February 27, 2008 APS  (432)

|  | Sit | Stand | Walk |
|---|---|---|---|
| Number of hours at a time | 2 | 2 | 2 |
| Total hours/day | 12 | 4 | 4 |

August 6, 2008 APS (376)

|  | Sit | Stand | Walk |
|---|---|---|---|
| Number of hours at a time | 2 | 2 | 2 |
| Total hours/day | 12 | 4 | 4 |

(compare 376 with 432).  *See, Levitian v. Sun Life and Health Ins. Co. (U.S.)*, 2011 U.S. Dist. LEXIS 14113, *13-14 (S.D.N.Y. Feb. 9, 2011) (finding a determination to be arbitrary and capricious, when *inter alia*, the insurer reversed a prior determination "without any change of circumstances"…"solely on factors not given weight or even considered as relevant during the original evaluation.").

    Moreover, even if *arguendo*, Hartford's reliance on the February 28, 2008 APS were correct, the restrictions and limitations noted by Dr. Hiesiger do <u>not</u> support full-time work in Young's occupation.  Dr. Hiesiger indicated that Young only can sit for two hours at one time, when according to the PDA, Young's occupation requires the ability to sit 8+ hours at one time. Thus, Young can work part-time (as she demonstrated at Milbank with extensive accommodations), but she cannot work full-time—the standard under the Policy.

    Dr. Hiesiger also noted that Young was restricted above the shoulder, at waist/desk level and below waist/desk level reaching to 1-33% of the day, which was significantly less than the functional requirements in the PDA, including:  twisting of head 66-100% [of a work day]; upper extremity ROM [range of motion] 66-100% [of a work day]; and whole body ROM [range of motion] 66-100% [of a work day].  (376; 432; 1055-56).

12

C.      YOUNG'S DISABLING MIGRAINES AND THE *TODD* CASE

Hartford relies on one case, *Todd v. Aetna Health Plans*, 62 F. Supp. 2d 909 (E.D.N.Y. 1999), *aff'd* 31 Fed. Appx. 13 (2d. Cir. 2002), to support a broad assertion that migraines do not generally prevent a person from working on a continuous basis.   (Hartford Br., pp. 21-22). Hartford's reliance on this case is not substantial evidence.

First, Hartford never asserted this as a reason in support of denial during the claim process.   It is therefore, an improper new reason for denial precluded under ERISA.   *See, e.g., Curry v. American International Group*, 579 F. Supp.2d 413, 422 (S.D.N.Y. 2008) (precluding defendants from raising new reasons for the first time in litigation), *aff'd*, 341 Fed. Appx. 731 (2d Cir. 2009).

Second, Hartford cites to no evidence in the record to justify this as a medical conclusion. (Hartford Br., pp. 21-22).

Third, the court in *Todd* never endorsed that "it is well established that migraines are generally not a condition that prevents someone from working on a continuous basis."  (Hartford Br. pp. 21-22).  The Court holds only "[g]iven this record, Aetna's determination that plaintiff's migraines are not continuously disabling and that she has not demonstrated a full disability was not arbitrary or capricious."  62 F.Supp.2d at 914 (emphasis added).  The Court makes no finding that migraine headaches in general, as opposed to Ms. Todd's in particular, are not continuously disabling.

Fourth, even if *arguendo*, *Todd* stood for the general proposition advanced by Hartford, the fact that an illness is not disabling for a majority of its sufferers is weak evidence for the proposition that it is not disabling for a particular individual.  *See, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918-19 (7th Cir. 2003) ("The fact that the

majority of individuals suffering from fibromyalgia can work is the <u>weakest</u> <u>possible</u> <u>evidence</u> that Hawkins can, especially since the size of the majority is not indicated; it could be 50.00001 percent.")  (emphasis added).

## II. HARTFORD FAILED TO PROVIDE YOUNG WITH A FULL AND FAIR REVIEW

As described in more detail in Sections II(B), III(B), and III(C) of plaintiff's brief in support of summary judgment, dated February 11, 2011, Hartford failed to provide Young with a full and fair review.

## III. HARTFORD'S CONFLICT OF INTEREST IS OF GREAT IMPORTANCE

An insurer is unduly influenced by its inherent conflict of interest (being both claim payor and decider) when it prioritizes its profits at the expense of full and fair claim adjudication. Indeed, in *Metropolitan Life Ins. Co. v. Glenn,* the Supreme Court indicated that "ERISA imposes higher-than-marketplace quality standards on insurers" and that an administrator must "discharge [its] duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries."  128 S.Ct. 2343, 2350 (2008).

An insurer bent on increasing its profits (or decreasing its losses) can do so in primarily two different ways.[4]  First, it can reduce administrative costs, such as reducing claims staff, setting quotas, etc.[5]  Second, it can direct, incentivize and/or influence claims staff to pay fewer claims than predicted by the underwriting department.   In other words, they can put the proverbial finger on the scale by having employees who have a tendency to prefer claim denial. This must be subtle because if an insurer simply denies all or most claims, it would scare policyholders away.   To the extent that either course of action adversely affects the insurer's

---

[4] An insurer could also increase premiums, but this would be constrained by market forces.
[5] See Section IV of Plaintiff's Brief in Support of Summary Judgment, dated February 11, 2011.

unbiased and objective assessment of claims, then it violates ERISA's higher-than-marketplace quality standards.

Hartford asserts it was not influenced by its conflict of interest because it "does not provide its Examiners and Appeal Committee members with any incentives, remuneration, bonuses, awards, achievements, or other recognition based in whole or in part upon the denial or termination of claims," (Hartford Br., p. 23), as if the lack of a "sledgehammer" approach absolves Hartford.  But, providing direct financial incentives to promote claim denials and terminations is not the only way to influence employee behavior, and is not the way of a sophisticated company like Hartford.  Instead, Hartford has created a culture of claim denial, whereby employees are praised when they deny more claims than average and are criticized when they grant more claims than average.  While an employee's direct compensation may not be affected, employees clearly understand what is expected of them if they want a future at Hartford.

An example of this can be found in the performance appraisal of a Rehabilitation Clinical Case Manager ("RCCM") produced in another Hartford case.  (See Ex. K).  RCCM's, who are part of the claims team at Hartford, have a role in assisting claimants back to work.  This is the same type of individual who assisted with Young's return to work ("RTW") with Milbank.  The problem is that these employees are pushed by Hartford to create RTWs because RTWs financially benefit Hartford.  For instance, under the performance objective of "Facilitate outcome driven claim management plans through effective interactions with providers, claimants, policyholders and vendors," the RCCM received the following positive feedback:

> Chris achieved a total of 18 RTW, . . .  This represents an average of 32% of the rccm total of 47.  . . .  Her activities realized a cost savings of approx. $4,062,185.00 for the team.

(Ex. K, p. 2)(emphasis added).  See also, Ex. K, p. 7 ("Her total dollar savings were $3,131,224, which was 17% of the office and 3% of the network."); Ex. K, p. 13 ("Chris was end result focused which was demonstrated by her productivity and outcomes.").

The RCCM internalized this performance objective so well that in response to another review, she expressed that she was unhappy with not being credited with all the "RTWs" she thought she deserved.  She states:

> With that said, I would like to share some of the positive things that I have contributed the first half of this year.
> - Based on the COTS [Claim Outcome Tracking System] report printed on 6/11/06 I entered at least 13 full time rtws and 2 part time rtws (that went to FT [full-time]).  These outcomes were not included in my interim review and rtws are why RCCMs are at The Hartford!

(Ex. K, p. 17) (emphasis added).

Hartford again drove this performance objective home when performing a quality assurance review of one of her claims.  Hartford provided the following negative feedback for not considering RTW for the claimant:

> I cannot agree with your findings that this 35yo is too severe to consider for rehab.  With abilities policy, retrng [retraining] for sed occ [sedentary occupation] that will allow for positional changes is even consideration, and would be less costly than just paying 1.5 yrs of benefits without trying anything.  with this assessment how could t/c decision[6] be any different?  So we've bought claim for another 30 yrs?

(Ex. K, p. 11)(emphasis added).  This assessment obviously would make the RCCM think twice about not pushing an RTW in the future.

---

[6] "T/C" refers to the change in contract terms usually after 24 months of disability.  For the first 24 months, a claimant must establish disability from his or her regular occupation.  After 24 months, a claimant must establish disability from any occupation to which he or she is qualified by education, training and experience.  The change in definition necessitates an additional determination by Hartford.

The push to terminate or reduce claims is further bolstered by Hartford's "success story" initiative.  Under this initiative, Hartford specified a quota for "success stories."  A memo from Barbara S. Campbell, AVP and Director, Clinical Practices, provides:

> **Success Stories**:
> - Success Stories should be sent to Janet monthly.
> - While each office has flexibility in how they will encourage staff to increase the number of success stories submitted, a general guideline is that each staff member should submit no less than one (1) success story per month.

(Ex. I, p. 6218).  Thus, regardless whether the circumstances dictated it, employees were required to produce at least 1 success story (*i.e.*, an RTW) per month.  The fact that Hartford's employees are focused on saving Hartford money rather than the merits of individual claims is directly contrary to ERISA's requirement that fiduciaries act solely in the interests of plan participants.[7]  *See, Glenn*, 128 S.Ct. at 2350.

Hartford cites the findings of other courts to help bolster its assertion that it successfully walled off its claims units.  (Hartford Br., pp. 24-25).  But, this is a particularly perilous way to make factual findings because those cases were decided on different factual records.  Moreover, there are other cases that find the opposite.  *See, e.g., Montour v. Hartford Life & Accident Ins. Co.*, 582 F.3d 933, 943-945 (9th Cir. 2009) (finding Hartford's decision making process showed signs of bias; there was no evidence that Hartford took active steps to assure accurate claim assessment; Hartford took an advocacy position); *Finley v. Hartford Life & Accident Ins. Co.*, 2009 U.S. Dist. LEXIS 105516, *25 (N.D. Ca. Oct. 26, 2009) (no evidence that Hartford has taken active steps to reduce potential bias and to promote accuracy); *Williams v. Hartford Life &*

---

[7] The focus on RTW, and thus saving money for Hartford, is pervasive.  A memorandum from Ms. Campbell specifies, "Need for increased focus on RTW in STD."  She writes, "Desired Outcome from meeting = Establish Task Force to prepare and present suggestions to CBP Team and STD/LTD Business Partners re: ways to improve RTW impacts in STD."  (Ex. I, p. 6234).

*Accident Ins. Co.*, 2009 U.S. Dist. LEXIS 94857, *29 (S.D.Oh. Sep. 25, 2009) (no evidence that Hartford has taken active steps to reduce potential bias and to promote accuracy).

Moreover, despite allegations in the self-serving Declaration of Bruce Luddy to the contrary (Luddy Declaration, ¶¶3-5), Hartford <u>failed</u> to wall off its appeals unit from its claims unit. The head of the appeals unit, Bruce Luddy reports directly to Barbara Campbell, the Assistant Vice President of Risk Management,[8] who reports directly to Glenn Shapiro, the head of the claims department. (Ex. L). Accordingly, appeals are improperly subordinate to claims. It is obviously improper to rely on a subordinate to overrule the work of a superior.

Hartford also does not maintain a wall between claims and finance. The Assistant Vice President of Financial Operations has a dotted line reporting relationship with Mr. Shapiro, so there is, at a minimum, coordination between claims and finance. (Ex. L).

Hartford also maintains bonus plans that compensate employees based in part on their own performance and part on the "success" of Hartford. (Ex. M). As described above, employees have clear understandings of what is expected of them and what they can do to save Hartford money.

## IV.   HARTFORD SHOULD BE SANCTIONED PURSUANT TO FED. R. CIV. P. 37(c)(1)

Plaintiff respectfully requests that this Court strike the self-serving Declaration of Bruce Luddy dated February 9, 2011 pursuant to FED. R. CIV. P. 37 (c)(1). Rule 37(c)(1) provides that if a party that fails to provide information or identify a witness as required by Rule 26(a), the party will not be permitted to use that information or witness to supply evidence at trial or on a motion, unless the failure was substantially justified or is harmless.

---

[8] Barbara Campbell was AVP and Director, Clinical Practices. She was then promoted to Assistant Vice President of Risk Management.

Here, Hartford failed to disclose Bruce Luddy in its Rule 26(a) Disclosure Statement. (Ex. N).  In its Disclosure Statement, Hartford merely states, "[a]t this time, other than the parties herein, their agents, servants, and/or employees and those persons identified in the claim file (annexed hereto as Exhibit "B"), defendants know of no other witnesses regarding the within occurrence."  *Id*. at 2.  Exhibit B to the Disclosure Statement is Young's claim file.  There is no reference to a "Bruce Luddy" in the 1,100+ page claim file.

Without proper disclosure, Hartford, however, heavily relies on the self-serving Luddy Declaration in support of its assertion that Hartford was not influenced by conflict of interest. (Hartford. Br., p. 23).  Hartford's failure to disclose Bruce Luddy pursuant to Rule 26(a) is prejudicial and harmful because it deprived Young of crucial information concerning a pivotal issue in Young's case—Hartford's conflict of interest.

## CONCLUSION

For all of the foregoing reasons and those specified in plaintiff's memorandum of law in support of summary judgment, this Court should deny summary judgment in favor of Hartford.

Dated: New York, New York
       February 25, 2011

                                   Respectfully submitted,

                                   /s/ Scott M. Riemer_____
                                   Scott M. Riemer (SR5005)
                                   Riemer & Associates LLC
                                   60 East 42nd Street, Suite 1750
                                   New York, New York 10165
                                   (212) 297-0700

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 25, 2011 I served a true and complete copy of the foregoing Opposition Memorandum of Law by transmitting the same by electronic mail to the following individuals at the e-mail addresses indicated:

> Michael H. Bernstein
> Sedgwick Detert Moran & Arnold LLP
> 125 Broad Street, 39th Floor
> New York, New York 10004-2400
> Tel.: (212) 422-0202
> Fax: (212) 422-0925
> *Attorneys for Defendant*
> *Hartford Life Group Insurance Company*

I also certify that this document filed through the ECF system will be sent electronically to all registered participants on February 25, 2011.

Dated: New York, New York
      February 25, 2011

> /s/Scott M. Riemer
> Scott M. Riemer