UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SUSAN A. YOUNG,

                   Plaintiff,

       - against -

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, et al.,

               Defendants.

09 Civ. 9811 (RJH)

**<u>MEMORANDUM OPINION AND
ORDER</u>**

Richard J. Holwell, District Judge:

      Susan A. Young ("Young") brings this suit pursuant to Employee Retirement Income

Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), alleging that her long-term disability

("LTD") benefits were improperly terminated by defendant the Hartford Life and Accident

Insurance Company ("Hartford").  Young was employed as an attorney by Milbank, Tweed,

Hadley & McCloy, LLP ("Milbank") when she suffered an unusual injury to her neck.  Her neck

injury later required several operations and rendered her unable to work for substantial periods of

time.  When Young did return to work, she worked part-time.  After several years, Hartford

determined that Young's condition had improved to the point that she could return to work full-

time.  When Hartford terminated Young's benefits, she argued that migraine headaches

continued to render her disabled.  Young administratively appealed her termination of benefits,

and Hartford upheld its determination upon appeal.  Young then brought the instant suit.  On February 11, 2011, Young moved and Hartford cross-moved for summary judgment.  Hartford also moves to strike one of Young's exhibits.  For the reasons below, the Court denies Young's motion for summary judgment and grants Hartford's cross-motion.  Hartford's motion to strike is also granted.

## BACKGROUND

Young began work as an attorney for Milbank on October 2, 1995.  (Mendez Decl., Ex. B (hereinafter "Record"), 0994.)  Young enrolled in a disability benefits plan with Continental Casualty Company, and this plan was later taken on by Hartford on November 30, 2003.  (Defs.' Mem. 2.)  On August 18, 2004, Young filed a claims form indicating that she had injured herself at some time during May 2004 at home while brushing her teeth.  (Record, 0994.)  As a result of this unusual, but debilitating injury, Young was unable to sit for prolonged periods.  (*Id.*, 0995.) She could no longer report to work as of August 17, 2004.  (*Id.*, 0757.)  On September 16, 2004, Hartford approved Young's request for short-term disability ("STD") benefits through October 1, 2004.

That fall, Young sought treatment from Dr. Michael Mizhiritsky.  On October 11, 2004, Dr. Mizhiritsky placed the following restrictions on Young's activities:  "Restrictions:  No sitting >20 min intervals.  No lifting, pulling, pushing, carrying >10 lbs.  No overhead reaching."  On October 29, 2004, Sheree Feigelson, Milbank's benefits analyst, completed a Physical Demands Analysis ("PDA") of Young's position.  She determined that Young's position required her to work an average of twelve hours per day, five days per week with weekends as needed.  (Record, 1055.)  She was required to stand for half hour intervals and sit for eight-plus hours at one time with alternate sitting and standing as needed. (*Id.*)  Over the course of an entire day, she was

2

required to stand for a total of two hours, walk for a total of one hour, and sit for at least eight

hours.  (*Id.*)  She was required to lift documents that usually weighed between three and five

pounds, but up to ten pounds.  (*Id.*, 1056)  And her job required "twisting of head," "upper

extremity ROM [range of motion]," and "whole body ROM" between 66-100% of her day.  (*Id.*)

Eventually, Young exhausted her STD benefits and began to use her long-term disability

("LTD") benefits.[1]  On February 14, 2005, Young underwent a posterior cervical laminectomy, a

type of spinal surgery.  (Record, 0198.)  For this procedure, she chose a doctor, Dr. Barry Moore,

based in Pennsylvania located approximately 3.5 hours from her home in New York.  (*Id.*, 0186.)

She chose this doctor despite his distance from her home because he was a family friend who

had treated her father and because she was having difficulty getting a diagnosis in New York.

(*Id.*)  Young was approved for LTD benefits while recovering from this surgery.  (*Id.*, 0198)

Following her surgery, Young was not cleared by her doctor to return to work for

approximately one year.  On January 31, 2006, she reported to Hartford that  she lived in a multi-

level apartment with a bedroom upstairs, walked or took public transportation in order to get out

of the house, and had walked fifteen blocks to physical therapy regularly until she completed her

course of treatment with physical therapy.  (*Id.*, 0178.)  She was also able to cook "light meals,"

work at her computer some, and go shopping at the grocery store for small items.  (*Id.*)

On February 13, 2006, Dr. Moore released Young to return to work part-time on

February 20, 2006, subject to several restrictions.  (*Id.*, 0168.)  These restrictions were as

follows:

> [N]o overhead lifting or reaching, and no bending or crouching; no lifting,
> carrying, pushing, pulling of more than 3 pounds; ability to change position every
> 20 minutes; ability to sit/stand/walk or perform computer work no longer than 20

---

[1] Defendants suggest that Young's STD benefits ran out on February 11, 2005.  (Defs.' Mem. 4.)  The Record
suggests, however, that her LTD benefits began on May 10, 2005.  (*See* Record, 1133, 1165.)

> minutes at a time; discontinue any activity upon occurrence of numbness or
> tingling in the arms and legs until the problem subsides; change position or
> recline in a resting position at lest [sic] every 2 hours.

(*Id*.)  In addition, Dr. Moore recommended that certain changes be made to Young's work area, including that she receive a desk chair with cervical/head support, a wireless headset, equipment to change the position of her computer keyboard, voice recognition software and a Dictaphone. (*Id*., 0739.)  He also recommended that Young's work area be modified so that she could both stand and sit while working and that she be allowed to take breaks to change positions at least every two hours.  (*Id*.)  In order to accommodate Young's needs, Hartford commissioned an ergonomic assessment to improve her workspace.  (*Id*., 0157.)  Young returned to work part-time on February 21, 2006, working twenty-one hours per week.  (*Id*., 0162.)

On April 14, 2006, Young stopped working in anticipation of another surgery.  (*Id*., 0138.)  On April 28, 2006, Young had an anterior cervical discetomy performed by Dr. Roger Ostdahl, a doctor affiliated with Dr. Moore.  (*Id*., 0132, 0576)  Young was initially scheduled to return to work part-time on August 24, 2006 (*id*., 0127), but on the day she was supposed to return to work, Young reported that she had tripped and stumbled on the sidewalk and would be unable to return to work as scheduled (*id*., 0126.)  By letter dated September 18, 2006, Dr. Ostdahl released Young to return to work with the same restrictions as before.  (*Id*., 0125.) Young returned to work on September 28, 2006.  (*Id*.)

Despite some set-backs in her physical therapy due to minor accidents or near accidents, Young continued to work part-time for the remainder of 2006 and throughout 2007.  On September 18, 2007, Hartford received an updated medical report from Dr. Ostdahl regarding Young's condition.  Dr. Ostdahl noted that Young was showing signs of improvement, specifically that "recent lateral cervical spine x-ray demonstrates a stable situation with evidence

4

of progressive fusion maturation at C5-6 and C6-7." (*Id.*, 0099.)  The doctor recommended that she continue in physical therapy and work part-time. (*Id.*)

On November 8, 2007, Young had another milestone conversation with Hartford.  She revealed that she was still in pain. (*Id.*, 0096.)  She stated that although she could cook with light cookware, she was unable to cook with heavy pans. (*Id.*)  She also stated that she had had to learn to eat and write with her left hand because she found using her right hand painful. (*Id.*, 0096-97.)  She also reported that she had begun seeing a Dr. Emile Hiesiger for pain management. (*Id.*, 0096.)  Dr. Hiesiger's notes on December 28, 2007 indicate that Young "continues to improve," but that she still reports pain and is receiving steroid injections. (*Id.*, 0086.)  On February 21, 2008, Young reported to Hartford that she had begun to undergo radio frequency treatments and steroid injections. (*Id.*, 0090.)

Young's treatment continued into 2008.  On February 27, 2008, Dr. Hiesiger issued a report indicating that Young was able to sit for periods of two hours at a time for a total of twelve hours a day, stand or walk for two hours at a time for a total of four hours a day, and occasionally lift things up to twenty pounds. (*Id.*, 0088.)  Her condition was described as "permanent." (*Id.*)  The report also stated that Young would be able to make reaching motions above the shoulder, at waist level and below the waist only occasionally. (*Id.*, 0432.)  Despite having received a report indicating that she could sit twelve hours a day (with breaks), Hartford continued to pay Young LTD benefits.

On April 4, 2008, Young learned that her employment would be terminated with Milbank effective August 29, 2008. (Compl., ¶ 48.)  Shortly after on April 7, 2008, Young began to suffer headaches following her third radiofrequency lesioning procedure. (*Id.*, 0380; 0077.)  She informed her doctor on May 9, 2008 that she suffered severe headaches of varying intensity and

disabling effect twice per week and milder headaches three times per week.  (*Id.*)  On May 7,

2008, she informed Hartford that she was suffering headaches approximately 2-3 times per week.

(*Id.*, 0083.)  On July 11, 2008, Dr. Hiesiger notes that Young had no headaches since taking

inderal.  However, on July 29, 2008, Young left a voicemail message for Hartford indicating that

she had been out of town for several days visiting her sick grandmother.  (*Id.*, 0080.)  She stayed

longer than expected because she was suffering from severe headaches.  (*Id.*)  She also stated

that she was consulting with her doctor regarding her migraine headaches, which she was getting

3-4 times per week.  (*Id.*)  She had been experiencing improvement with the medication that her

doctor had prescribed, but the benefits had abated recently.  (*Id.*)

On August 11, 2008, Hartford received another attending physician statement ("APS")

from Dr. Hiesiger.  (*Id.*, 0077.)  This APS stated that Young's condition required that she work

under the same restrictions as before, that is she was able to sit for two hours at a time for a total

of twelve hours per day, she was able to walk for up to two hours at a time for a total of four

hours, and occasionally able to lift up to twenty pounds.  (*Id.*, 0078.)  No mention of Young's

migraines was made in the APS although he noted that she was taking inderal, a well known

migraine headache medication.  Upon review of the update, the administrator, Joseph Ross

("Ross"), assigned to Young's case requested that a nurse review her file to determine whether

Young continued to be disabled.  (*Id.*)  Barbara Phelps ("Phelps") reviewed her file and

concluded on August 18, 2008 that Young's condition did not seem to be disabling at present.

(*Id.*, 0077.)  Phelps recommended termination of Young's LTD benefits.  (*Id.*, 0075.)  That next

day, Hartford received an email from the benefits analyst at Milbank Tweed informing them,

apparently for the first time, that Young would be laid off at the end of the month.  (*Id.*, 0076.)

6

On August 27, 2008, Hartford informed Young that it would be terminating her LTD as of August 29, 2008.  In explaining its decision, Hartford cited the recommendation of Dr. Hiesiger regarding how much sitting, standing, etc. Young could tolerate and concluded that Young could perform her duties as an attorney even with these restrictions.  (*Id.*, 0355.)  In addition, it noted that information submitted by Dr. Hiesiger "shows that you have had no . . . headaches [since] inderal and that your neck is doing well."  (*Id.*)  This appears to be a reference to Dr. Hiesiger's office visit notes of July 11, 2008 and the APS he completed on August 9, 2008.

On October 9, 2008, Young sent Hartford a letter appealing the termination of her benefits.  (*Id.*, 0337-38.)  In the letter, Young did not dispute that her neck pain no longer presented significant barriers to returning to work, but rather argued that her migraines were disabling.  (*Id.*)  She attached a letter from Dr. Hiesiger that contained a more detailed description of her current condition.  (*Id.*, 0339-40.)  Dr. Hiesiger confirmed that Young's neck pain was "significantly better."  However, he noted that she developed "severe, intractable migraines" in April 2008, continuing to date.  Dr. Hiesiger stated that Young's "headaches occur up to three times a week and at least one of them is disabling."  (*Id.*, 0339.)  He further detailed, "Essentially they are common migraines in terms of their pattern and description, however [sic] the distribution of the headache which tends to be in the cervico occipital midline up to the vertex, is atypical of migrainous headache."  (*Id.*, 0340.)  Dr. Hiesiger characterized the headaches as a side effect of the radiofrequency lesioning treatment on her neck.  (*Id.*)  In addition, Dr. Hiesiger attached notes regarding the nature of Young's migraines from a doctor's visit on August 8, 2008 and notes from five telephone calls, the first of which was dated August 29, 2008.  (*Id.*, 0341-47.)  The letter stated that Young was to see Dr. Alex Mauskopf, a

headache specialist, in the near future.  Young did so, but she never provided her medical records

pertaining to her visits to Hartford (other than in an April 2009 letter).  (Defs.' Mem. 13.)

Juan Mendez ("Mendez"), the appeals specialist assigned to Young's case, requested an

independent peer review of Young's case file.  (Record, 0071.)  Dr. Leonid Topper, a board

certified neurologist licensed to practice medicine in New York and New Jersey, reviewed

Young's case.  (*Id*., 0318-22.)  Dr. Topper reviewed Young's file and spoke with Dr. Hiesiger,

who relayed the contents of his conversations with Dr. Mauskop.  (*Id*.)  Dr. Topper also reviewed

Dr. Hiesiger's handwritten treatment notes, but noted that they were "hardly [sic] to read."  (*Id*.,

0320.)  After reviewing Young's file, Dr. Topper concluded that Young was capable of "light

level of work duty on a full-time basis," referring to a Department of Labor work category.  (*Id*.)

He noted that her neck problems no longer prevented her from sitting for continuous periods.

(*Id*.)  He also stated, "The headache doesn't fit into any known category of primary or secondary

headaches, after extensive evaluations done by Dr. Hiesiger and Dr. Mauskop.  Therefore, the

headache is essentially self-reported, and a link to prior cervical spine surgeries is not

established."  (*Id*., 0321-22.)

On December 18, 2008, Mendez sent Young a detailed letter indicating that he was

upholding the determination that Young was no longer disabled.  (*Id*., 0210-14.)  He explained

that Dr. Topper had concluded after speaking with Dr. Hiesiger and reviewing his

recommendations that Young's neck and spine issues no longer prevented her from working as

an attorney.  (*Id*., 0213.)  He also reviewed the evidence proffered by Young in support of her

contention that her migraines were disabling.  He summarized the contents of Dr. Hiesiger's

October 6, 2008 letter and the medical records appended thereto.  (*Id*., 0211.)  He also

summarized Dr. Topper's findings, emphasizing that Dr. Topper had concluded that there was no

evidence beyond Young's own reports to support the conclusion that she was suffering from severe migraine headaches.  (*Id.*)  In Mendez's words,

> Dr. Topper also indicated that the evidence does not establish any particular relation between your cervical spine surgeries and your symptoms of headaches.  Therefore, it is Dr. Topper's opinion that your migraine headaches are consistent with self-reported symptoms, as the medical findings do not correlate with such symptoms.

(*Id.*, 0213.)  Mendez explained that he did not credit Dr. Hiesiger's findings  that Young's headaches continued to be disabling because "the information contained in [the documentation Dr. Hiesiger provided in support of Young's appeal] is based on [Young's] own self-reports and no specific medical findings are documented to support a particular impairment and/or loss of function during such period of time."  (*Id.*, 213.)

In a letter dated April 17, 2009, Dr. Mauskop submitted information regarding his treatment of Young to Hartford.  (Reimer Affirm., Ex. G.)  He detailed the various medications and treatments he had prescribed for Young, none of which he described as entirely effective. (*Id.*)  He concluded by observing,

> Ms. Young has shared your December 18, 2008 letter with me.  In the letter you claim that a specific etiology for Ms. Young's migraine headaches has not been identified or determined.  It is a well-know [sic] fact that specific causes of migraine headaches remain unknown.  Despite this knowledge about the etiology, according to the International Headache Society's Classification Ms. Young clearly suffers from chronic migraine headaches."

(*Id.*)  Dr. Mauskop's letter does not contain information regarding the headache's frequency or duration or regarding how disabling the headaches tend to be.

The terms of Young's policy provide that Young qualifies as disabled if she meets both an occupation qualifier and an earnings qualifier.  The occupation qualifier provides,

**Occupation Qualifier**

*Disability* means that during the *Elimination Period* and the following 60 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

1) continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation;* and

2) not *Gainfully Employed.*

(Mendez Decl., Ex. A, 0014.)  The earnings qualifier provides,

**Earnings Qualifier**

*You* may be considered *Disabled* during and after the *Elimination Period* in any month in which *You* are *Gainfully Employed,* if an *Injury* or *Sickness* is causing physical or mental impairment to such a degree of severity that *You* are unable to earn more than 80% of *Your Monthly Earnings* in any occupation for which *You* are qualified by education, training or experience. On each anniversary of *Your Disability, We* will increase the *Monthly Earnings* by the lesser of the current annual percentage increase in *CPI-W,* or 10%.

*You* are not considered to be *Disabled* if *You* are able to earn more than 80% of *Your Monthly Earnings.* Salary, wages, partnership or proprietorship draw, commissions, bonuses, or similar pay, and any other income *You* receive or are entitled to receive will be included. Sick pay and salary continuance payments will not be included. Any lump sum payment will be prorated, based on the time over which it accrued or the period for which it was paid.

(*Id*.)  The plan explicitly vests Hartford with discretionary authority in making benefits

determinations:

The Policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable, by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendment thereto. The plan administrator and other plan fiduciaries have discretionary authority to determine *Your* eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to Continental Casualty Company to determine *Your* eligibility for benefits and to interpret the terms and provisions of the Policy.

(*Id*., 0032.)

## STANDARD OF REVIEW

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Although generally an administrator's decision to deny benefits is reviewed *de novo*, where, as here, written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, [the Court] will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'"  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009) (internal quotation removed).  "[A] court may overturn a plan admininstrator's decision to deny benefits only if the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Durakovic v. Bldg. Svcs. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (internal quotation removed).  In instances where an insurance company both evaluates and pays for disability benefits, the Supreme Court has recognized that this dual role can create a conflict of interest for the claims administrator.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008).  The existence of such a conflict "must be weighed as a factor in determining whether there is an abuse of discretion."  *Id*. at 115 (internal quotation removed).

## DISCUSSION

Young argues that two of her medical conditions prevented her from earning 80% of her pre-disability income, thus rendering her disabled within the meaning of her policy:  her neck condition and her migraine headaches.  She also argues that Hartford's determination that she was no longer disabled was undermined by procedural irregularities such as a conflict of interest and a failure to gather adequate information.  The Court finds Young's arguments to be

unpersuasive and does not find that Hartford abused its discretion in discontinuing Young's benefits.

## I. Impairment Resulting from Young's Neck Condition

The evidence is overwhelming that Young's neck impairment no longer prevented her from returning to work full-time at the time that Hartford terminated Young's LTD benefits. Young's own doctor, Dr. Hiesiger, concluded that Young was capable of sitting for periods of up to two hours for a total of up to twelve hours per day, walking for up to two hours at a time for a total of four hours, and occasionally lifting up to twenty pounds. Perhaps even more tellingly, when Young herself drafted a letter in support of her administrative appeal, she did not mention her neck problem at all in support of her continued disability. Rather, she argued exclusively that her migraine headaches prevented her from returning to work full-time. Finally, Dr. Topper conducted an independent review of Young's medical record and determined that she was capable of "light work."

Now, however, Young argues that her neck continues to prevent her from returning to work. First, she claims that Dr. Topper's findings do not support a conclusion that she was capable of returning to her job because he stated that she was capable of doing "light work" whereas Young's attorney job was a "sedentary" position. (Pl.'s Mem. 12.) These job categories were created by the Department of Labor and have specific meanings as defined by federal regulation. The categories describe an individual's "*maximum* sustained work capability." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00 (emphasis added). Per the Department of Labor, "The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work." *Id*. In other words, when Dr.

12

Topper concluded that Young was capable of performing "light work," this finding included a finding that Young was capable of performing sedentary work.

Young also argues that she was incapable of returning to work because the PDA conducted by Feigelson in October 2004 indicated that the demands of Young's job exceeded the limitations imposed by Young's doctors.  Young points to Feigelson's assessment that her job required her to sit for eight hours straight.  Yet a close examination of the form suggests that her job did not require her to sit for eight hours without any opportunity to change positions. Feigelson also checked a box indicating that Young was allowed to switch between sitting and standing as needed.  Based on this internal inconsistency within the form as well as the Court's own experience with the demands placed on attorneys, it seems unlikely that Young was required to sit for eight hours straight without the opportunity to stretch her legs or even use the restroom.

Young also argues that Feigelson's assessment stated that her position required "twisting of head" and "upper upper extremity ROM [range of motion]" between 66-100% of her day, which she claims was incompatible with Dr. Hiesiger's observation that she could reach for things only occasionally.  It should be noted, however, that Feigelson conducted her analysis of Young's position in October 2004.  When Young returned to work in February 2006, Hartford paid for an ergonomic assessment of Young's office and invested a substantial amount of money in ergonomic equipment and furniture.  Hartford notes that this furniture and equipment was tailored to Young's needs to accommodate her lack of mobility.  If Young's position still required her to twist her neck 66-100% of her day, it presumably would have been impossible for her to work even part-time.  But Dr. Moore cleared Young to work part-time as long as these specific changes were made to her workspace.  It can be inferred that Dr. Moore spoke with

Young about the demands of her job and determined that these accommodations would help ensure that Young would not have to twist her neck in an injurious manner.

Furthermore, as described above, Young herself did not argue that her neck problems prevented her from returning to work when addressing Hartford in her administrative appeal. Hartford has not argued that Young is procedurally barred from making these arguments now, but Young's failure to mention her neck as preventing her from returning to work in her administrative appeal is probative evidence of the fact that her work was not aggravating Young's problems with her neck. The evidence does not support a finding that Young's neck impairment prevented her from returning to work or, more to the point, that Hartford abused its discretion in so finding.

## II. Impairment Resulting from Young's Migraine Headaches

Young also argues that her migraine headaches prevented her from returning to work full-time. Young states that her migraines began soon after her third radiofrequency lesioning procedure on April 8, 2008. When Young first described her headaches to Hartford in May 2008, she stated that she was suffering from migraines two to three times per week. It appears that at some point over the summer, Young was headache-free after taking Inderal, but in late July, they returned. Young has tried various treatments, but they have not been entirely effective in providing relief. The doctors have not been able to isolate a particular cause of Young's migraines, nor does it appear from the evidence either in the administrative record or in Dr. Mauskop's disputed supplemental letter that Young's doctors verified that Young was suffering migraines through any independent tests. Although they confirm that Young suffered from migraines, their evidence seems to be Young's own reports of her symptoms.

14

The Court is sympathetic to the fact that it may be harder for patients whose ailments are grounded in their own subjective experience, rather than visible physical injury or other easily measured condition, to produce objective evidence of their conditions.  But in this case, even the subjective evidence of Young's condition is weak.  Young does not describe how long the headaches last or how long after a headache begins she can usually return to work.  She states that the headaches occur several times per week, but she has provided no evidence that she suffered from the headaches on particular dates or detailed their duration.  Although she claims that the headaches were frequently severe, she has not documented that the headaches ever forced her to stay home from work during the period she was employed.  This information is important because under the terms of Young's plan, it is not enough for Young to demonstrate that she suffers from migraines; she must also demonstrate that the migraines were so disabling that she was unable to perform her duties in such a manner that she earned 80% of her income.

Hartford overplays its hand when it argues, relying upon *Todd v. Aetna Health Plans*, 62 F. Supp. 2d 909 (E.D.N.Y. 1999), that migraines are not generally a disabling illness.  In that case, the insurance carrier informed the plaintiff that migraines were rarely disabling, *id*. at 912, but the court itself did not make any such sweeping statement, merely holding that there was no evidence that *the plaintiff's* migraines were continuously disabling, *id*. at 914.  Yet in another respect, Hartford's point is well taken:  Many people suffer from migraines, and not all of them are so incapacitated by their condition that they are unable to work.  Young was required to demonstrate not only that she suffered from migraines, but that she was disabled by them.

In instances where plaintiffs successfully argued that they should have received LTD benefits because of migraine headaches, the sufferers have provided more extensive information regarding the nature of the migraines and documented with a greater level of specificity why

15

their migraines rendered them unable to work.  For example in *Linck v. Arrow Elecs., Inc.*, the plaintiff kept a detailed diary of his activity levels and documented that he was in continuous pain and regularly taking powerful medications that could cause dizziness and concentration problems.  No. 07 Civ. 3078, 2009 WL 2408411, at *5 (D. Md. Aug. 3, 2009).  In *Solien v. Raytheon Long Term Disability Plan # 590*, the plaintiff's physician stated that she suffered from "[s]evere migraine headaches which [she] had been having daily, almost continuously" and stated that the was taking medications that caused her fatigue, loss of concentration and daytime drowsiness.  644 F. Supp 2d 1143, 1152 (D. Ariz. 2008).  In fact, the plaintiff's symptoms combined with the side effects of the medications she was taking were so severe that she nearly got into an accident.  *Id*.  And in *Rudzinski v. Metro. Life Ins. Co.*, the plaintiff's physician stated that her migraines were confirmed by an MRI and estimated that her migraines in conjunction with her fibromyalgia and chronic pain syndrome would prevent her from reporting to work 75% of the time.  No. 05 Civ. 474, 2007 WL 2746630, at *5 (N.D. Ill. Sept. 14, 2007).

In this case, by contrast, Young's doctors have extensively documented the medications they have tried to give her, but they have provided scanty evidence of how Young suffers.  Whereas the plaintiffs in each of the other three cases documented how their migraines prevented them from working, Young provided only the barest of evidence of how frequently she suffered from headaches, how long they lasted, whether she actually took sick days due to migraines prior to her termination, and how long her recovery time was.  *Cf. Schnur v. CTC Communs. Corp. Group Disability Plan*, 413 F. App'x 377, 379 (2d Cir. 2011) (upholding a denial of benefits where "even if fully credited, [the plaintiff's] symptoms did not warrant a finding of *total* and permanent disability").  Given the inadequacies in her submissions, the Court concludes that Hartford did not deny Young's benefits for reasons that were arbitrary and capricious.

16

### III.  Alleged Procedural Irregularities

#### A.  Conflict of Interest

Young claims that Hartford's determination of whether she should receive benefits was tainted by a conflict of interest.  Here, Hartford both administered Young's plan and paid benefits, so a potential for conflict of interest does exist.  *See Glenn*, 128 S. Ct. at 2348.  Young also argues that certain of Hartford's employees who administered her claims were not sufficiently neutral.  Young argues first, pointing to internal company records, that Ross, Young's claims administrator, and Mendez, her appeals administrator, were urged to speed up their work.  This information does not suggest that Ross and Mendez were encouraged to decide in favor of Hartford.  As such, it does not support an inference of conflict of interest.

Young also finds fault with Dr. Topper's neutrality because he is employed by a medical review agency that Hartford has hired on numerous occasions, and Dr. Topper himself has conducted a significant number of reviews for Hartford.  Young insinuates that Dr. Topper has an incentive to save a repeat customer money.  Several courts have considered and rejected this self-same argument, holding that absent some case-specific evidence that a doctor was biased, the mere fact that a professional was compensated for his or her services does not compromise their neutrality.  *Mugan v. Hartford Life Group Ins. Co.*, 765 F. Supp. 2d 359, 373 (S.D.N.Y. 2011); *Gessling v. Group Long Term Disability Plan for Emples. of Sprint/United Mgmt. Co.*, 693 F. Supp. 2d 856, 870 (S.D. Ind. 2010).

Young observes that Mendez and Phelps, the nurse who conducted a review Young's file, represented Hartford publicly.  Mendez represented Hartford in mediations, and both represented Hartford at sales calls and meetings.  Hartford observes that it has taken a number of steps to protect the neutrality of its appeals specialists, for example, its appeals specialists do not speak

with the claims administrators in evaluating appeals, they do not receive financial incentives for denying appeals, and they are evaluated based on the accuracy of their determinations.

In *Glenn*, the Supreme Court observed that a conflict of interest

should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

554 U.S. at 117.  Young argues, in effect, that Mendez and Phelps activities on behalf of Hartford demonstrate that they were not sufficiently walled off from firm finances.  Young's description of what these Mendez and Phelps were doing is vague.  She does not specify what sorts of mediations Mendez was involved in, nor does she describe what Mendez and Phelps' role was during these alleged sales calls.  Young does not cite and the Court is unaware of any case where a court held that these sorts of activities created a disabling conflict of interest.  At least one court has found that the fact that appeals specialists receive a bonus that is tied to Hartford's performance is not sufficient to create a conflict because the benefit each employee receives is too attenuated, despite the fact that these bonuses seem much more likely to encourage employees to feel concern for the company's overall financial health.  *Gessling v. Group Long Term Disability Plan for Emples. of Sprint/United Mgmt. Co.*, 693 F. Supp. 2d 856, 871 (S.D. Ind. 2010).

Nonetheless, even if the Court were to conclude that these activities compromised Mendez and Phelps' neutrality, such a finding would weigh only weakly in favor of a finding that a conflict existed.  Even if the employees felt compelled to look after Hartford's financial welfare as a general principle, there is no evidence that this feeling affected the outcome of Young's case.  *Cf. McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 134-137 (2d Cir. 2008)

18

(finding that a conflict of interest existed based on case specific factors, such as the fact that the insurer falsely told the plaintiff that an on-site doctor had reviewed his file when that was not the case and the fact that the insurer refused to consider a detailed submission from the attending physician because the physician did not sign it without informing the plaintiff or his physician of this difficulty).  The Supreme Court has advised that the existence of a conflict of interest should be considered merely as "a tiebreaker when the other factors are closely balanced."  *Glenn*, 554 U.S. at 117.  This is not a case where the factors are closely balanced.  Young's own doctor did not believe that her neck injury prevented her from returning to work, and Young provided insufficient documentation that supported her claim that her migraines prevented her from working.

### B.  Failure to Obtain Certain Records

Young complains that Hartford did not look into certain medical evidence that she claims would have supported her claim.  The policy contained provisions that placed the burden of providing documentation to support a finding of disability on the claimant.  (Mendez Decl., Ex. B, 0026.)  Young argues that Hartford was obligated to gather this information, relying upon selective quotations from a Tenth Circuit case.  (Pl.'s Mem. 10 (citing *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807-08 (10th Cir. 2004).)  The Second Circuit has never found that ERISA fiduciaries have a duty to gather information.  Still, even if such a duty were to exist, such a holding would not affect the outcome here because Young has not demonstrated that Hartford failed to collect readily available, *material* information.

Young argues that Ross, Young's claims administrator, should have followed up on Young's July 29, 2008 voicemail indicating that her migraines had returned.  Ross's letter discontinuing Young's LTD benefits does indicate that her migraines had resolved with

medication.  Mendez, however, in denying Young's appeal, noted her complaints that her migraines had begun again, but concluded that there was not sufficient evidence to support her claims that they so disabled her that she could not work.

Young also claims that Dr. Topper should have spoken with Dr. Mauskop directly, rather than relying on Dr. Hiesiger's secondhand report, and should have asked someone to transcribe Dr. Hiesiger's notes, which he noted were difficult to read.  But Young does not explain how taking these actions would have influenced Dr. Topper's report.  There is no evidence that Dr. Topper misunderstood any parts of Dr. Hiesiger's diagnosis because he had difficulty reading Dr. Hiesiger's handwriting.  Moreover, Dr. Topper spoke with Dr. Hiesiger directly, and there is no evidence Dr. Topper had any misunderstanding regarding Dr. Hiesgier's diagnosis during this conversation.  It is also unclear what additional information Dr. Topper could have unearthed if he had spoken to Dr. Mauskop directly.  Even Dr. Mauskop's April 2009 letter, which directly addresses the conclusions Mendez reached in denying Young's appeal, does not undercut Mendez's conclusion that Young's migraines do not disable her from work as the letter says nothing about their frequency and severity.  Even if Hartford had a responsibility to unearth this information, which Young has by no means demonstrated, it would  not have affected the outcome of her claim.

### C.  Dr. Topper's Expertise

Young argues that Hartford should not have commissioned Dr. Topper to review her file because he lacked sufficient expertise.  She makes this argument because Dr. Topper, while a board certified neurologist, primarily does research into pediatric neurology.  She also points to the fact that Hartford itself has determined that it will not seek future reviews from Dr. Topper

because his primary field is pediatrics.  (Reimer Decl. Ex. E, 4, 6, 13.)  Pursuant to 29 C.F.R. §

2560.503-1(h)(3)(iii),

> "[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."

29 C.F.R. § 2560.503-1(h)(3)(iii).  Young claims that Hartford did not meet this requirement in

employing the services of Dr. Topper.  Young cites no case where a court has applied such a

stringent reading of the regulation.  To the contrary, courts have eschewed such a "hyper-

technical" reading of the regulation, finding for example that a "medical diagnosis by a chronic

pain, neck injury, or carpal tunnel specialist [need not] be reviewed by another equally

credentialed specialist."  *Larque v. SBC Commc'ns, Inc.,* No. 04-CA-0883, 2005 WL 3447740,

at *6 n.13 (W.D.Tex. Dec. 14, 2005); *Lee v. Aetna Life & Cas. Ins. Co.,* No. 05-Civ-2960, 2007

WL 1541009, at *5-6 (S.D.N.Y. May 24, 2007) (rejecting an argument that an internist was

unqualified to review the diagnosis of a rheumatologist).  Young has provided no explanation as

to why a neurologist whose primary field of expertise is pediatrics would offer a different

opinion or not have sufficient expertise to evaluate her claim.  Although Hartford might have

decided subsequently to retain a neurologist with greater expertise, that fact alone does not mean

that Dr. Topper was unfit under the relevant regulation.

### III. Hartford's Motion to Strike

Hartford moves to strike Dr. Mauskop's letter, attached as an exhibit to the Reimer

declaration.  This letter is dated April 17, 2009, approximately four months after Young's

administrative appeal was denied.  The Court has reviewed the letter and does not believe that

the letter would have affected the outcome of this case.  While Dr. Mauskop concludes that Ms.

Young suffers from "chronic migraines," he says nothing of their frequency or severity, nor does he address whether they disable her from full-time employment. (Indeed, he notes that her most recent medication has proven "beneficial to alleviating" her symptoms.) Nonetheless, it is well established that the Court may not consider documents outside of the administrative records in determining whether a claims administrator's decision was arbitrary and capricious. *Bergquist* v. *Aetna U.S. Healthcare*, 289 F. Supp.2d 400, 411 (S.D.N.Y. 2003). Because this document is not a part of the administrative record, the Court grants Hartford's motion to strike the document.[2] While not necessary to the Court's opinion, the exclusion of Dr. Mauskop's letter only serves to strengthen Hartford's case.

## CONCLUSION

For the foregoing reasons, Young's motion for summary judgment [31] is denied, and Hartford's cross-motion for summary judgment [24] is granted. Hartford's motion to strike [49] is granted.

**SO ORDERED.**

Dated: New York, New York

September 23 , 2011

Richard J. Holwell

United States District Judge

---

[2] Young argues that when she submitted this letter to Hartford, it was not tardy because she had the right to update her file for 180 days after the initial determination to terminate her benefits was made. In support of this argument, she cites the benefit termination letter, which states that she has 180 days to file an appeal. (Record, 0223.) The letter does not state that she will have the opportunity to make multiple submissions, and Young cites no legal authority for this proposition.